**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

--------------------------------X

RABBI SHEA SEIDENFELD, RABBI SIMON A. INDIG, CONG KHAL BNAI YISSUCHOR OF RIBOTITCH., CONG ZICHRON REB CHAIM ZANVIL

Plaintiffs,

v.

SANDRA M. MUNOZ, in her official capacity and on the behalf herself and on behalf of all other New York State Supreme Court Judges,

Defendants.

--------------------------------X

**COMPLAINT**

Class Action

RABBI SHEA SEIDENFELD,, RABBI SIMON A. INDIG, CONG KHAL BNAI YISSUCHOR OF RIBOTITCH., and CONG ZICHRON REB CHAIM ZANVIL (“Plaintiffs”), by and through their attorneys, Levi Huebner & Associates, P.C., for their Complaint alleges, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1. New York State, through its judges, compels religious practice under threat of incarceration and explicitly has, is, and threatens to continue to incarcerate individuals where they refuse to participate in religious ceremonies performed by *specified* clergy:[1] by coercing not only religious action, but religious action under the auspices of a specified sect, the State violates the Establishment Clause, which means "at the very least that government may not demonstrate a preference for one particular sect or creed"[2] and "at a minimum, [] guarantees that government may not coerce anyone to support or participate in religion or its exercise."[3]

2. The above is not hyperbole: Judge Sandra M. Munoz ("Judge Munoz" or Munoz, J.) has incarcerated an individual twice, this gentleman continues to be incarcerated to this day, and has explicitly stated that she would continue to incarcerate that individual indefinitely, until he performs a religious act, namely a "*get*," in front *particular* rabbis who do not share that individual's beliefs and which would require that individual to break core tenets of his beliefs. Judge Munoz explicitly specified that *only* rabbis contained in a list of "approved" *beth dins*, those with the "correct" beliefs, could perform the compelled religious ceremony.

3. Plaintiffs are not parties to a currently pending state action and bring the instant action to vindicate their rights to perform various religious ceremonies absent state interference. Namely they seek a declaration that any judicial pronouncement limiting, or disallowing, the

---

[1] These clergy do not necessarily share the beliefs of those who are compelled to participate in the religious acts.

[2] *Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492 U.S. 573, 605 (1989).

[3] *Lee v. Weisman*, 505 U.S. 577, 587 (1992).

ability of religious clergy to perform religious rites and rituals in favor of other clergy is violative of the Establishment Clause of the First Amendment of the United States Constitution; a declaration that any judicial pronouncement specifying that a certain religious body, or an "approved" body, must perform a religious action, or that certain religious bodies may not perform a religious action, is violative of the Establishment Clause of the First Amendment of the United States Constitution; a declaration that CPLR 7510 is unconstitutional as applied; a declaration that Judiciary Law 751 is unconstitutional as applied; and further declaratory relief.

4. Plaintiffs have each suffered individualized harm as a result of the practices which they seek to declare unconstitutional and each Plaintiff seeks to vindicate their rights with respect to the practices complained of herein—by the very nature of the declarations Plaintiffs seek, however, there are wide reaching consequences which will benefit multiple actors and vindicate the Constitution.

5. To the outside world, each of the Plaintiffs would simply be viewed as a rabbi, or an "Ultra Orthodox" congregation, but this ignores the core nature of the Plaintiffs' religious beliefs and the significant diversity that exists in Judaism.[4] The Plaintiffs are composed of "Satmar Ultra-Orthodox" Chasidic Jews.[5] This "Satmar Religious Community" is defined by

---

[4] Judaism is not uniform and monolithic and the Israeli Rabbinate, does not "control" all Jews in the same way that the Pope does not control all Christian sects; it would be risible to state that Papal pronouncements dictate the legitimacy of Baptist preachers.

[5] Chasidic Judaism embraces religious practices existing at or around the 18th Century in Europe. It emphasizes strict adherence to and practice of the original laws, customs, rituals, traditions and sacred principles of Judaism given on Mount Sinai without change or reform and as followed throughout the centuries and handed down in the established rules of Judaism. Since post WWII various Chassidic communities have immigrated to the United States to escape persecution. There are numerous sects within this larger denomination of which the Satmar Religious

certain beliefs which are religious but touch on every aspect of life, core to those beliefs are a notable "ultraconservatism" and a religious rejection of modern secular culture, together with a strong religiously based anti-Zionism. For the Satmar Religious Community, there is little that could be as objectionable as a "state-sponsored Israeli Rabbinate." The dichotomy between the Satmar Religious Community and the Rabbinate (or for that matter any secularized or modern form of Judaism) is just as stark as that of fundamentalist Catholicism with the most progressive of reform Protestantism. Moreover, because the "schism" is so recent—the Satmar Religious Community was organized in the mid-to-late 1800's as a rejection to modernizing trends in European Jewish communities and Judaism—the religious strife and difference is readily comparable to the Reformation of the 1500s. These are competing sects and vastly different forms of religion.

6. New York is currently, and previously has, utilized the State's most coercive remedy to compel a religious act with a specified sect—by doing this the State has labeled which sect is "correct" and which sect may "properly" perform a religious rite.

---

Community is one; a particular and notable aspect of the Satmar Religious Community is its religious opposition to Zionism and Israeli state-sponsored religion.

Again, to draw on an example, this may be viewed as a similar religious rejection of Tibetan Buddhists of the Chinese Communist Party's establishment of "Tibetan Buddhism" utilizing CCP sponsored and recognized monks in CCP-controlled Tibet. The state-controlled "religion" is considered not only irreligious but an offense.

## JURISDICTION

7. This action arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8. Munoz, J. is a public official of the State of New York and her offices are located within this District. Additionally, Munoz, J. on information and belief resides in the District. Accordingly, this Court has personal jurisdiction over Defendant Munoz.

9. The proposed class is a class of public officials, who by their very office, must reside in the state and over whom this Court has personal Jurisdiction.

## VENUE

10. 11. Venue in the Eastern District of New York is based on 28 U.S.C. § 1391(b).

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Munoz, J., on information and belief resides in this District and all proposed class defendants are residents of New York; moreover, venue would, in any event, be proper under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

12. Rabbi Shea Seidenfeld ("Rabbi Seidenfeld") is a member of the Satmar Religious Community and a rabbi. Rabbi Seidenfeld, as a rabbi, officiates over various religious duties including participating in and officiating *get* ceremonies. Moreover, Rabbi Seidenfeld, acting as a rabbi and a member of his Congregation, Cong Zichron Reb Chaim Zanvil, provides religious

services, guidance, mediation, and arbitration through his Congregation's *ad hoc* dispute resolution body commonly known as Beth Din Mishpat HaTorah.

13. Rabbi Seidenfeld wished to assist a congregant in performing a *get* ceremony, but was, and currently is, prevented from doing so by the actions of Munoz, J.

14. Munoz, J., pronounced from the bench that that a congregant, Igor Rubinov ("Incarcerated Congregant"), would need to perform, the then-state-compelled *get* ceremony at a "*beth din*" approved by the Rabbinate.

15. Neither Rabbi Seidenfeld nor Incarcerated Congregant believe that the Rabbinate is a religious body *at all*,[6] nor do either believe that the Rabbinate shares their religion, the act is akin to ordering a Anabaptist[7] child to be Baptized at three weeks utilizing a Catholic priest—it simply would require the person to violate their beliefs and perform a religious ceremony utilizing the clergy of a competing sect.

16. But for the actions of Munoz, J., Rabbi Seidenfeld would have officiated a *get* ceremony for Incarcerated Congregant according to religious dictate and performed his religious duties in the rite.[8]

---

[6] The late Satmar Rabbi Joel Teitelbaum declared the Israeli Rabbinate a secular body, and prohibited Satmar Religious Community to recognize, rely, or utilize the secular "Rabbinate."

[7] Anabaptists, on information and belief, reject the idea of infant baptism.

[8] The acts of Munoz, J., made the performance of the ceremony impossible: the Plaintiffs and Incarcerated Congregant believe it is a "sin" to assist another in violating religious dogma, and to provide a *get meusah* (an invalid get) would be a sin and to assist another in the commission of such no less sinful—for a *get* to be *kosher* it cannot be given under compulsion or threat of compulsion. Beyond this, Munoz, J., explicitly stated that *until* and

17. Aside from the ongoing harm, that of preventing Rabbi Seidenfeld from preforming a religious rite with a member of his Congregation, Rabbi Seidenfeld has lost "business." Rabbi Seidenfeld is in the "business" of acting as a Rabbi both in various ceremonies and in *beth din*. As a result of Munoz, J.'s actions, multiple congregants have cancelled participation in his *beth din*, noting that the *beth din* would might not be "recognized," and expressing fear that Rabbi Seidenfeld's r*eligious* exhortations would not only be subject to secular compulsion, but that the same would be compelled by a court and the compulsion would specify non-coreligionists to perform religious acts,[9] and that the congregant would face the impossible choice of potentially violating their religious beliefs or indefinite incarceration.

18. As a result of the above, Rabbi Seidenfeld has additionally suffered a monetary injury—as a rabbi he is compensated (albeit at a minimal rate) by the congregants who consume his services.

19. Rabbi Seidenfeld lives in a community which has been deeply affected, aside from the direct harm noted above, by the actions of Munoz, J. Munoz, J., in effect, declared that because Rabbi Seidenfeld, his congregation, his *beth din* and his coreligionists are not approved of by State, they are not "recognized" jews or "approved clergy" and are therefore unfit to practice the rites of their religion.

---

*unless* Incarcerated Congregant participated in a *get* ceremony utilizing "recognized" rabbis, he would remain incarcerated.

[9] Again, the sects which were specified by Munoz, J., as being acceptable are wholly different than the Satmar Jewish Community.

20. Cong Zichron Reb Chaim Zanvil ("Zichron") is a religious corporation formed under the laws of the State of New York in the County of Rockland.

21. Rabbi Seidenfeld is a rabbi at Zichron.

22. Zichron provides the religious services noted above in paragraph 12.

23. Zichron is not a congregation recognized by the Rabbinate; the *beth din* of Zichron is not recognized by the Rabbinate; and Zichron does not share the same beliefs as the Rabbinate.

24. The congregants of Zichron, and its clergy, are of a different sect than the Rabbinate or any religious body recognized by the Rabbinate.

25. Aside from Zichron being unable to perform a *get* ceremony for Incarcerated Congregant, Zichron and its *beth din*, commonly known as Beth Din Mishpat HaTorah, has lost and will continue to lose "clients" as a result of the actions of New York State. As a result of Munoz, J.'s actions, multiple congregants have cancelled participation in Zichron's *beth din*, noting that they were not certain the *beth din* would be "recognized," and expressing fear that any r*eligious* exhortations[10] would not only be subject to secular compulsion, but that the same would be compelled by a court and the compulsion would specify non-coreligionists as required

[10] *Beth dins* operate as religious arbitration bodies and their "awards" often contain both secular and religious relief. For instance, a *beth din* award may require a party to pay certain amounts, but likewise advise a participant on the correct interpretation of certain religious dogma or direct that the congregant perform a religious act.
This would be similar to a priest ordering a party after confession to take various secular acts and to recite a number of prayers and take communion.

clergy,[11] and that the congregant would face the impossible choice of potentially violating their religious beliefs or indefinite incarceration.

26. As a result of the above, the Congregation has additionally suffered a monetary injury: it is compensated at a minimal rate for the performance of certain rabbinical religious services by the congregants and community members who consume the services.

27. Rabbi Simon A. Indig ("Rabbi Indig") is a member of the Satmar Religious Community and a rabbi at Cong Khal Bnai Yissuchor of Ribotitch, Rabbi Indig, as a rabbi, officiates over various religious duties including participating in and officiating *get* ceremonies. Moreover, Rabbi Indig, acting as a rabbi, provides religious guidance, mediation, and arbitration through his congregation's dispute resolution body.

28. The acts of New York State, through its judges, have caused Rabbi Indig to lose "rabbinical business." Rabbi Indig is in the "business" of acting as a Rabbi both in various ceremonies and in *beth din*. As a result of the actions complained of, multiple congregants have cancelled participation in his *beth din*, noting that they were afraid the *beth din* would not be "recognized," and expressing fear that r*eligious* exhortations in the award would be subject to secular compulsion, that the same could be compelled by a court, and that the congregant would face the impossible choice of potentially violating their religious beliefs or indefinite incarceration.

---

[11] Again, the sects which were specified by Munoz, J., as being acceptable are wholly different than the Satmar Religious Community.

29. As a result of the above, Rabbi Indig has additionally suffered a monetary injury—as a rabbi he is compensated (albeit at a minimal rate) for the performance of his rabbinical services by the congregants who consume his services.

30. Rabbi Indig pays taxes in the State of New York and he lives in a community which has been deeply affected, aside from the direct harm noted above, by the actions of New York State Courts, which in effect, have declared that because Rabbi Indig, his congregation, and his coreligionists are not approved of by State, they are not "recognized" jews, or "approved clergy" and are therefore unfit to practice the rites of their religion. This is a mark of indignity that affects every member of his community and Rabbi Indig.

31. Cong Khal Bnai Yissuchor of Ribotitch ("Khal Bnai") is a religious corporation formed under the laws of the State of New York in the County of Rockland.

32. Rabbi Indig is a rabbi at Khal Bnai.

33. Khal Bnai provides the religious services noted above in paragraph 27.

34. Khal Bnai is not a congregation recognized by the Rabbinate; the *beth din* is not recognized by the Rabbinate; and Khal Bnai does not share the same beliefs as the Rabbinate.

35. The congregants of Khal Bnai, and its clergy, are of a different sect than the Rabbinate.

36. By adopting the Rabbinate's position, New York State has delegitimized Khal Bnai: the acts are no different than were New York to declare that solely Saudi-recognized imams could practice Islam or that those recognized by the Republic of Iran could preach the

Koran—adopting the views of a religious state, which has adopted the religion of a particular sect, to the detriment of all others concretely harms any who do not share the "state sanctioned" religion.

37. Khal Bnai has lost and will continue to lose "clients" as a result of the actions of New York State. As a result of the actions complained of, multiple congregants have cancelled participation in his *beth din*, noting that they were afraid the *beth din* would not be "recognized," and expressing fear that r*eligious* exhortations in the award would be subject to secular compulsion, that the same could be compelled by a court, and that the congregant would face the impossible choice of potentially violating their religious beliefs or indefinite incarceration.

38. Munoz, J. is a New York State Supreme Court Judge.

39. Judge Munoz, at all times complained of herein, was acting under color of law and resides within the state.

40. Judge Munoz, who is sued in her official capacity, would adequately represent the interests of the proposed class. In essence, New York State shares identical interests enforcing and applying its laws through Judge Munoz or any other judge; any other judge would share the same interests in the purely declaratory relief sought; and finally any other judge, named in their official capacity, would have available the same defenses and legal arguments as Judge Munoz.

41. The proposed class is all other Supreme Court Justices of New York State.

# FACTS

42. Judaism has innumerable sects, many of whom share certain beliefs and decry others. The religion is extremely complex.

43. The Satmar Religious Community is not headed by the Israeli State or the Israeli Rabbinate: indeed, the Satmar Religious Community[12] does not share the beliefs of the Israeli State or its "sanctioned" religion.

44. Religion, and rabbinical authority, is integral to the functioning of the Satmar Religious Community. Members, per religious doctrine, are bound to seek redress from clergy rather than secular authorities in all but the rarest of circumstances.

45. A significant portion of the intra-community disputes involve dispute resolution through *beth din*. *Beth din* are religious quasi arbitral bodies of one or three rabbis—in the Satmar Religious Community these are always men.[13]

46. Rabbis within the community specialize in various religious duties and bodies of doctrine—in the same way a lawyer may specialize in riparian law, a rabbi may specialize in the minutiae of dietary rules, financial disputes, marital or other religious matters.

---

[12] Even within the community there are multiple schisms and certain "sub-sects" are deeply antipathetic toward one another—it is not unusual in the community to hear certain sub-sects denounced as being irreligious or cults.

[13] Many of the beliefs of the Satmar Religious Community do not sit well with modern norms and by the very nature of the belief system involves the application of religious doctrine literally, as written, in religious texts.

47. Because all of the above are addressed by religious texts, and rabbinic commentaries, the study of a particular field is involved.

48. *Gittin* (the plural of *get*) are in the simplest of terms religious dissolutions of marriage. The process, ceremonies, and ultimate documents, are highly ritualized and complex. The process is dictated by passages contained in religious texts, requires various ceremonial and ritual undertakings, involves the making of various religious representations and performances, and are performed (and witnessed by) clergy.

49. The process may somewhat clumsily be understood by comparing a secular wedding in a courthouse with the ritual common to religious weddings—the ceremonies are distinctly religious and different sects within Judaism are deeply in disagreement about how, if, when, and by whom these ceremonies may be performed and under what circumstances.

50. A *get* cannot be compelled: it must be given freely and received freely; a *get* given under compulsion is not only religiously invalid but represents a sin.

51. Even a *beth din* or a rabbi in normal circumstances cannot compel, order, or require a *get,* rather certain rabbis in recent years began to advise the giving of a *get*. In other words, one does not see clergy *mandating* the performance of a *get* ceremony and any pronouncement by clergy would be at the most precatory.

52. New York State regularly indirectly compels the giving of *gittin*. Normally this occurs via the statutory denial of benefits or disparate treatment—for instance, it would be

statutorily impossible in New York for a party to seek secular redress without first making certain representations vis-à-vis the "removal of barriers" (including religious barriers).[14]

53. This statutory scheme, however, is accompanied by direct actions of various Supreme Court judges. Judges on a regular basis threaten parties with incarceration should they fail to perform religious acts and participate in a *get* ceremony.

54. The above, almost always, results in the party violating their religion, performing the religious action, and mooting any challenge to the action.

55. In more recent years, however, New York State Judges have been confirming arbitration awards that contain precatory language "advising" the performance of religious action and interpreting the same as being mandatory injunctions.

56. The above has occurred on multiple occasions and the judges who have made such decisions remain on the bench, are in areas where there is a significant Satmar Religious Community, and have demonstrated no inclination to change three distinct practices.

57. The first practice involves threatening litigants in off-record dialogues, where the judge directs the reporter to go off record and the judge informs the litigant that she or he will incarcerate the litigant, or hold the litigant in contempt, *unless* the religious act is performed.

[14] Plaintiffs are not seeking to challenge any portion of New York's Domestic Relations Law, and note the following to provide context.

58. The second practice involves the direct legal coercion of the act, the state court judge will enjoin performance of the religious action directly after confirming an arbitration award which the court interprets as mandating a religious act.

59. The third practice involves actual incarceration, or threat of incarceration, with a purge condition of a religious action, *i.e.*, the state court judge specifies that the litigant is in contempt (for violating an injunction requiring the performance of a religious action) and sets as a purge condition the performance of that religious action.

60. Munoz J., specifically has done all of these and applied Judiciary Law 751 in such a way as to directly and legally coerce performance of a religious action with specified clergy. She has done this on multiple occasions: Incarcerated Congregant was incarcerated in Rikers Island for a period of six-months and is currently incarcerated (again) for a period of six months.

61. Judge Munoz, specifically stated that he would "rot" in Rikers until he performed the religious action and further stated that she was going to order him to be placed in general population, noting the danger of being placed amongst hardened criminals. She additionally noted that perfroming the religious ceremony with his co-religionists (namely rabbis of Zichron, including Rabbi Seidenfeld would not be accepted or purge the contempt).

62. Incarcerated Congregant not only was willing, so soon as religiously possible,[15] to give a *get* and had only been prevented from doing so by Judge Munoz actions and the actions of Incarcerated Congregant's former spouse: Incarcerated Congregant wished to have his clergy,

---

[15] Again, because he was under compulsion it was religiously impossible for him to give a *get*—a *get* given under threat or contempt is the equivalent of a kosher ham, it is an impossibility.

namely Rabbi Seidenfeld of Zichron, perform the religious act and his spouse refused to have the act performed by Zichron.

63. Judge Munoz, learning that there was a religious dispute over which sect would perform the religious ceremony required that the ceremony be performed by a particular sect—namely clergy without the Satmar Religious Community and clergy approved and recognized by the Israeli Rabbinate.

64. Incarcerated Congregant, will remain incarcerated because he has no intention to violate his religious beliefs and will not utilize clergy who do not share his beliefs.

65. The above matter has received significant attention in the, somewhat insular, Satmar Religious Community: although it is common for state court judges to coerce the performance of religious actions, that is usually quiet and purposefully non-publicized. In the most common circumstance, the party who is subject to coercion bows to the threats and gives a *get meusah* and does not announce the same to the community because it is religiously improper to have acted in this way, and publicizing the same results in shame rather than approbation.

66. New York State courts, regularly confirm *beth din* "awards" as arbitration awards under CPLR 7510.

67. As noted above, those awards often contain religious and non-religious pronouncements and relief.

68. New York State judges not only confirm, and later enforce, the provisions of those awards that require non-religious action and relief but specifically interpret and confirm

provisions of those "awards" as mandatory injunctions requiring the performance of religious actions and enforceable *via* contempt.

69. This is not limited to awards that contain mandatory language but extends to awards that are precatory on their face. *Beth din* awards do not compel, coerce, or require the giving of a *get*, rather they may state that giving a *get* is the right thing to do or the thing that should be done.

70. By interpreting these awards in such a way and confirming the awards in such a way as to mandate the performance of religious action, New York State judges naturally directly compel religious action.

71. Judge Munoz has compelled the performance of a religious act and required that the same be performed by specified clergy based on an "award" confirmed in this manner.

72. The above, has and will continue to harm Plaintiffs: no religious congregant wishes to attend a *beth din* if the pronouncements of the *beth din* may be compelled by a secular court and that secular court might compel the performance of the religious acts contrary to religion or requiring clergy of a different sect to perform the religious act.

73. The performance of a *get* not only requires for one to associate with clergy (or at least male coreligionists) but likewise requires religious speech to be made.

74. The acts complained of here deprive the Plaintiffs of the ability to take part in this colloquy, compels particular religious speech, and prohibits such speech to be made to any but a particular audience. In other words, by not only requiring a get, but by requiring it to be

performed by specific clergy, the practice prevents others, namely Plaintiffs, from being the recipients of this speech.

75. New York has no legitimate interest in compelling this speech or association nor in barring the speech or association. It is unthinkable that there could be any legitimate reason for New York to interfere in a religious ceremony.

## COUNT ONE

### *42 U.S.C. § 1983 – First and Fourteenth Amendment*

76. All prior paragraphs are incorporated.

77. The First Amendment to the United States Constitution prohibits abridgment of freedom of speech, the freedom of association, and the establishment of religion.

78. The First Amendment is applied to the states through the Fourteenth Amendment.

79. The statutes, Judiciary Law 751 and CPLR 7510, as applied, compel speech, compel association, and establish religion.

80. The requirement that any person or party must utilize particular clergy to perform a religious act or face incarceration violates the Establishment Clause because it directly coerces religious participation and favors one sect over another to perform the religious act.

81. The setting of the performance of a religious act as a purge condition likewise violates the Establishment Clause because it directly coerces religious participation.

82. The confirmation of arbitration awards requiring the performance of religious acts violates the Establishment Clause because it directly coerces religious participation.

83. All of the above, compel a party to speak a particular religious message to a particular religious audience and are neither the least restrictive means nor in furtherance of a compelling state interest, thus they violate the Free Speech Clause of the First Amendment.

84. Judge Munoz and the purported class were acting under color of state law.

85. The above has caused direct and concrete harm to the Plaintiffs and that harm is independent of the harm suffered by Incarcerated Congregant.

86. Plaintiffs are not participants in any ongoing state proceeding and do not seek to enjoin any action nor interfere with state court proceedings.

87. While certain rights of Incarcerated Congregant may coincide with those of Plaintiffs, Plaintiffs have individualized interests in the relief they seek and they seek to vindicate their own rights separate from the rights of Incarcerated Congregant.

88. Plaintiffs currently are suffering concrete harm including financial harm.

89. It is near certain that Plaintiffs will continue to suffer harm absent the instant action: congregants (completely aside from Incarcerated Congregants) will continue to avoid the religious services of Plaintiffs and avoid utilizing the *beth din* services of Plaintiffs absent a declaration which makes clear that the Rabbinate-Sanctioned religious bodies are not the sole religious bodies in New York who can perform certain religious services.

90. Even were it possible for Plaintiffs to intervene or participate in a state action, no remedy would be meaningfully and timely provided.[16] Everyday significant harm is done to the Plaintiffs and such harm, with the exception of the minimal monetary harm, is irreparable.

[16] By way of example, Incarcerated Congregant appealed the order interpreting the arbitral award to require performance of a religious action nearly one year ago, he has since been incarcerated twice once for a period of six-months and currently for another six-months. He has appealed both of the holdings of contempt which set as a purge condition the performance of a religious act. Despite all this, and motions to stay, expedite, give preference, etc., no appeal has been decided, or for that matter even calendared, no stay has issued, no expedition has been granted. Currently, it is doubtful that any decision will issue soon, thus Plaintiffs continue to suffer ongoing harm.

**WHEREFORE**, Plaintiffs, requests judgment and order as follows:

A. Declaring CPLR 7510 unconstitutional as applied

B. Declaring New York Judiciary Law § 751 unconstitutional as applied ;

C. Declaring all judicial pronouncements limiting, or disallowing, the ability of religious clergy to perform religious rites and rituals in favor of other clergy unconstitutional;

D. Declaring all judicial pronouncements specifying that a certain religious body, or an "approved" body must perform a religious action, or that certain religious bodies may not perform a religious action unconstitutional;

E. Declaring the judicial practice of setting the performance of a religious action as a purge condition unconstitutional;

F. Declaring all judicial pronouncements directly coercing the performance of a religious act unconstitutional; and

F. Granting Plaintiff such other and further relief as the Court deems just and proper.

[Signature Follows]

Dated: Brooklyn, NY
September 10, 2026

Respectfully submitted,

By: /s/Levi Huebner

Levi Huebner & Associates P.C.
464 Malbone Street, Suite 100
Brooklyn, NY 11217

(212) 354-5555

*Attorneys for Plaintiffs*